STEPHEN P. BERZON (CA Bar No. 46540)*
SCOTT A. KRONLAND (CA Bar No. 171693)*
ZOE PALITZ (CA Bar No. 275752)*
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:     (415) 421-7151
Facsimile:     (415) 362-8064
Email:         sberzon@altber.com
Email:         skronland@altber.com
Email:         zpalitz@altber.com

BENJAMIN SACHS (DC Bar. No. 479092)*
1525 Massachusetts Avenue
Cambridge, MA 02138
Telephone:     (617) 384-5984
Facsimile:     (617) 496-5156 (fax)
Email:         bsachs84@gmail.com

JAMES M. PIOTROWSKI (ID Bar. No. 5911)
Herzfeld & Piotrowski, LLP
P.O. Box 2864
824 W. Franklin Street
Boise, Idaho 83701
Telephone:     (208) 331-9200
Facsimile:     (208) 331-9201
Email:         james@idunionlaw.com

*Attorneys for Plaintiff*

*Application for Pro Hac Vice admission to be filed

UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 370,<br><br>        Plaintiff,<br><br>    v.<br><br>LAWRENCE G. WASDEN, in his official capacity as Attorney General for the State of Idaho,<br><br>        Defendant. | CASE NO.: **4:15-cv-00500**<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## Introduction

1. This action is brought under 42 U.S.C. § 1983, 29 U.S.C. § 158(a)(3), and Article III, § 2 of the United States Constitution to challenge Idaho Code § 44-2003(3) because it is preempted by the National Labor Relations Act ("NLRA") and violates the Fifth Amendment of the United States Constitution.

2. Idaho Code § 44-2003(3) is part of Idaho's Right to Work law. The NLRA allows states to prohibit "agreements requiring membership in a labor organization as a condition of employment." 29 U.S.C. § 164(b). But Idaho's Right to Work law goes beyond prohibiting agreements that require membership in a labor organization or its functional equivalent. The Idaho statute also prohibits agreements requiring bargaining unit employees to "pay *any* . . . fees, assessments, or other charges of any kind or amount to a labor organization." Idaho Code § 44-2003(3) (emphasis added).

3. Idaho Code § 44-2003(3) is preempted by the NLRA insofar as it prohibits employers and labor unions from agreeing that all bargaining unit workers, regardless of union membership status, must pay a service fee for unit representation expenses.

4. To the extent that Idaho Code § 44-2003(3) prohibits a union from obtaining reimbursement for the cost of collective bargaining representation that the union is obligated to provide to non-members by federal law, the state provision also effects an unconstitutional taking in violation of the Fifth Amendment of the United States Constitution.

## Jurisdiction and Venue

5. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because this action seeks to redress the deprivation, under color of State law, of rights secured by the Constitution and laws of the United States.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Defendant resides in this District.

**Parties**

7. Plaintiff International Union of Operating Engineers Local 370 ("Local 370" or "the Union") is a labor organization representing approximately two thousand working men and women in Idaho and Eastern Washington. Local 370 maintains offices in Pocatello and Boise, Idaho. Local 370 represents two types of operating engineers: (1) hoisting and portable engineers, including heavy equipment operators, mechanics, and surveyors in the construction industry, and (2) stationary engineers, who operate and maintain the physical plant systems in buildings such as hotels, schools, hospitals, and industrial complexes.

8. Defendant Lawrence G. Wasden is sued in his official capacity as Attorney General for the State of Idaho. Defendant Wasden has responsibility for enforcing Idaho's Right to Work law, Idaho Code § 44-2009, and has the duty to assist local prosecutors in its enforcement, *id*. § 67-1401(7).

**Background**

**A. The NLRA**

9. The NLRA provides for a democratic system of exclusive representation collective bargaining. If a majority of the employees in a bargaining unit choose a particular union to represent them, that union is designated as "the exclusive representative[] of all the employees in [the] unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U.S.C. § 159(a). A majority of the employees in a bargaining unit can also decertify the union at prescribed times. *See id*. § 159(e).

10. The NLRA imposes on the "exclusive representative" a legal duty to represent all workers in the bargaining unit, not just those who choose to be union members. For example, in the context of collective bargaining, the union cannot negotiate a wage increase for its members in exchange for accepting no increase for non-members in the bargaining unit. The terms and conditions of the collective bargaining agreement apply equally to all members of the bargaining unit without regard to membership in the union. Similarly, the union must make available on equal terms to non-members any grievance and arbitration procedure. Engaging in collective

bargaining and processing employee grievances require the union to expend significant financial resources.

11. The NLRA permits a union and an employer to enter into an agreement that requires, as a condition of employment, that all employees in the bargaining unit, regardless of membership status, pay a service fee to cover the union's representational expenses.

12. The NLRA broadly preempts state efforts to regulate labor relations. The NLRA prohibits states from regulating any activity that the NLRA arguably protects or prohibits, as well as any conduct that Congress intended to leave unregulated to allow for the free play of economic forces.

13. Notwithstanding the NLRA's broad preemptive force, section 14(b) of the Labor Management Relations Act permits states to prohibit "agreements requiring membership in a labor organization as a condition of employment." 29 U.S.C. § 164(b).

**B. Idaho's Right to Work Law**

14. Idaho's Right to Work law purports to prohibit more than just "agreements requiring membership in a labor organization," covered by section 14(b). Idaho Code § 44-2003(3) provides that "[n]o person shall be required, as a condition of employment or continuation of employment, . . . (3) to pay any dues, fees, assessments, or other charges of any kind or amount to a labor organization." Thus, Idaho's Right to Work law purports to prohibit even a voluntary agreement between an employer and a labor union that would require all employees to pay a service fee for the cost of the union's collective bargaining representation.

15. Violations of the Right to Work law are punishable as criminal misdemeanors, with penalties of fines and imprisonment. *See* Idaho Code § 44-2007.

16. Idaho law imposes upon the Attorney General a duty "to investigate complaints of violation or threatened violations of [the Right to Work law] and to prosecute all persons violating any of its provisions, and to take all means at their command to ensure its effective enforcement." Idaho Code § 44-2009.

### C. Local 370's Representation of the MotivePower Bargaining Unit

17. For over thirty years, Local 370 has served as the "exclusive representative" of a bargaining unit of operating engineers employed by MotivePower in Boise, Idaho. The MotivePower engineers represented by Local 370 build, rebuild, and refurbish locomotives.

18. There are currently approximately 400 employees in the bargaining unit. Only thirty-two percent of bargaining unit employees are members of the Union. These Union members pay monthly dues to Local 370 equal to 2.5 times the hourly wage rate. For example, a production worker with wages of $15.50 per hour pays monthly dues of $38.75.

19. Sixty-eight percent of bargaining unit employees are not members of the Union. Non-members pay no dues or service fees to Local 370. Despite opportunities for a majority of bargaining unit employees to decertify the Union, including in 2015, they have not opted to do so.

20. Local 370 spends significant financial and human resources representing the employees in the MotivePower bargaining unit — Union members and non-members alike.

21. In August 2015, Local 370 entered into a new three-year collective bargaining agreement with MotivePower. That agreement includes an hourly wage increase, premium pay for all overtime hours worked, increased contributions to a defined-benefit pension plan, and keeps employees' health care co-pays low during a time of escalating health care costs. The wages and benefits bargained by Local 370 apply to all employees in the bargaining unit, regardless of Union membership status.

22. The collective bargaining agreement was the product of several months of work by Local 370. The prior agreement was set to expire on June 30, 2015. Local 370 and MotivePower first met in May 2015. Between May and August 2015, when the new contract was ratified, Local 370 and MotivePower met six times for negotiations. Each time, Local 370 sent a bargaining committee including the Union's Business Manager (the highest official in the Union), a Business Representative, the Chief Steward, and members of the bargaining unit. The Business Manager traveled seven hours by car from the Union's office in Spokane, Washington

to Boise for each of these meetings. Each negotiation session involved significant financial burdens for the Union, including the cost of motels, neutral meeting space, meals, supplies, and gas.

23. Collective bargaining required extensive work and costs for the Union aside from time spent at the negotiating table. Before bargaining began, Union officials arranged meetings with bargaining unit employees to determine the employees' priorities and develop a "wish list" for negotiations. The Union made several substantive proposals to MotivePower in the course of negotiations. Each proposal took between two and six hours to prepare. Local 370 also contacted outside counsel several times for legal advice related to the collective bargaining proposals. During the summer of 2015, the Union's Business Manager and one Business Representative spent more than eighty percent of their time working on the collective bargaining agreement with MotivePower.

24. The collective bargaining agreement at MotivePower is negotiated every three years. But even in months and years without contract negotiations, MotivePower requires the highest maintenance of any bargaining unit represented by Local 370. Although Local 370's Business Manager is responsible for overseeing the Union's work for approximately two thousand employees at almost one hundred employers throughout Southern Idaho and Western Washington, he spends on average twenty percent of his time doing work specifically related to the MotivePower bargaining unit. Similarly, although the Business Representative assigned to MotivePower is also responsible for bargaining units at six other employers in Southern Idaho, he spends approximately seventy-five percent of his time on work for the MotivePower bargaining unit alone.

25. Over the past decade, labor-management relations at MotivePower have become increasingly difficult. Approximately two times per month on average, a worker at MotivePower asks Local 370 to file a grievance on his or her behalf. Processing grievances involves a significant expenditure of the Union's human and financial resources. Local 370's Business Representative investigates each grievance by speaking with the grievant, the Shop Stewards,

and others with knowledge of the issue, as well as by reviewing the collective bargaining agreement to determine whether MotivePower's conduct is grieveable. Assuming the Union determines that the collective bargaining agreement has been violated, the Business Representative and the Shop Stewards help the employee reduce the grievance to writing and file it with MotivePower. In addition, Local 370's Business Manager generally reviews all grievances before they are filed with MotivePower. This pre-filing process can take many hours of the Business Representative's and Business Manager's time. Once a grievance is filed, the Union represents the grievant at one or more labor-management meetings, and, depending on the nature of the grievance, the Union's Business Manager often travels from Spokane to be present for the meetings.

26. Local 370 processes grievances for Union members and non-members alike. For example, in May 2015, three bargaining unit employees (only one of whom was a member of Local 370) were involved in an accident while moving a locomotive. MotivePower took action to terminate the employees involved. The employees asked Local 370 to help save their jobs. The Business Representative spent many hours investigating and processing grievances on their behalf. After the grievances were filed, the Business Representative represented the employees in several lengthy meetings with MotivePower regarding the incident. After a month of challenging negotiations with MotivePower, none of the employees was terminated.

27. Even when there are no specific grievances to process, Local 370 provides regular contract administration to the MotivePower bargaining unit. The Business Manager of Local 370 visits MotivePower from Spokane at least monthly and the Business Representative visits up to two times per week to speak with employees and to ensure that the collective bargaining agreement is being implemented correctly. In addition to his in-person visits, the Business Representative communicates daily with the Shop Stewards and employees at MotivePower to address concerns and questions from both Union members and non-members, sometimes fielding dozens of calls and emails in a day. The Business Representative generally receives more telephone calls from non-members with basic questions about the collective bargaining

agreement than he does from Union members, because non-members do not attend Union meetings. The Business Representative also has meetings with management at MotivePower at least once per month to enhance labor-management cooperation and to resolve disputes quickly.

28. Although the work of the Union benefits all bargaining unit employees, it is paid for only by the minority of MotivePower employees who choose to be Union members. Many Union members are frustrated that their dues are used to underwrite the Union's work for non-members who pay nothing.

### D. Service Fee Proposal

29. On September 17, 2015, Local 370 proposed to MotivePower to enter into an agreement requiring, as a condition of employment, all employees in the bargaining unit to pay a service fee to the Union of 1.0 times the hourly wage rate. A copy of Local 370's proposal is attached as Exhibit A.

30. Under the proposed agreement, all service fees would be deposited by the Union into a segregated, interest bearing bank account ("the fair representation account"). Pursuant to the proposed agreement, funds in the fair representation account would be used by Local 370 solely to pay for costs related to negotiating and administering the collective bargaining agreement on behalf of this bargaining unit, including by investigating and processing grievances. *See* Exhibit A at ¶¶ 3–4.

31. At the end of each calendar year, the Union would provide to all bargaining unit employees an accounting of how any funds in the fair representation account were spent. *See id*. at ¶ 5. The Union would also provide annual notice to all bargaining unit members, as well as individual notice to all new hires, regarding the calculation of the fair representation fee and the employee's right to challenge the calculation of that fee, including the right to an appeal before an impartial arbitrator paid for by the Union. *See id*. at ¶ 6.

32. The proposal further provides that should the Union ever cease to be the exclusive representative of the bargaining unit, any funds in the fair representation account that were not

spent would be returned to the employees on a pro rata basis based on how much each employee paid in fair representation fees during that calendar year. *See id.* at ¶ 7.

33. MotivePower rejected Local 370's proposal, stating that it could not enter into such an agreement because of Idaho's Right to Work law. On information and belief, if not for Idaho Code § 44-2003(3), Local 370 could successfully negotiate a service fee agreement with MotivePower.

34. Idaho Code § 44-2003(3) has caused and continues to cause irreparable injury to Local 370.

## COUNT I

### Preemption by National Labor Relations Act

35. Plaintiff realleges and incorporates herein by reference each and every allegation and paragraph set forth previously.

36. Idaho Code § 44-2003(3)'s prohibition on voluntary agreements requiring an employee, as a condition of employment, to pay "dues, fees, assessments, or other charges" to a labor organization covered by the NLRA is preempted by the NLRA and violates 42 U.S.C. § 1983 insofar as it would prohibit the Plaintiff and MotivePower from entering into an agreement requiring bargaining unit employees to pay a service fee of any kind, including one to cover the cost of Local 370's collective bargaining representation.

37. As applied to unions covered by the NLRA, Idaho Code § 44-2003(3) is preempted and violates 42 U.S.C. § 1983 because it attempts to regulate concerted activities that are arguably or actually protected or prohibited by the NLRA.

38. As applied to unions covered by the NLRA, Idaho Code § 44-2003(3) is preempted and violates 42 U.S.C. § 1983 because it interferes with the free play of economic forces in collective bargaining over a mandatory bargaining subject, and because it attempts to regulate a subject of collective bargaining that Congress intended to leave for the parties to negotiate, free of state regulation.

## COUNT II

**Violation of the Fifth Amendment: Unconstitutional Taking**

39. Plaintiff realleges and incorporates herein by reference each and every allegation and paragraph set forth previously.

40. The Takings Clause of the Fifth Amendment of the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Fifth Amendment does not, however, allow the government to take the property of one private party for the sole purpose of transferring it to another private party. Such a taking for private use is presumptively unconstitutional.

41. As applied to unions covered by the NLRA, Idaho Code § 44-2003(3) effects an unconstitutional taking and violates 42 U.S.C. § 1983 insofar as it prohibits the unions from collecting any payment for services that federal law requires the unions to render to non-members.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for the following relief:

1. An injunction enjoining Defendant, his agents, employees, assigns, and all persons acting in concert or participation with him from enforcing Idaho Code § 44-2003(3) to the extent that it prohibits an employer and a union covered by the NLRA from agreeing that all bargaining unit employees, regardless of union membership status, must pay a service fee for unit representation expenses.

2. A declaration that § 44-2003(3) of the Idaho Code is preempted as applied to unions, employers, and employees regulated by the NLRA, and violates 42 U.S.C. § 1983;

3. A declaration that § 44-2003(3) of the Idaho Code is unlawful and invalid as applied to unions, employers, and employees regulated by the NLRA because it effects an unconstitutional taking in violation of the Fifth Amendment and 42 U.S.C. § 1983;

4. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

5. Such other and further relief as the Court deems just and proper.

Dated: October 22, 2015

Respectfully submitted,

By: _____

STEPHEN P. BERZON
SCOTT A. KRONLAND
ZOE PALITZ
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:   (415) 421-7151
Facsimile:    (415) 362-8064
Email: sberzon@altber.com
Email: skronland@altber.com
Email: zpalitz@altber.com

BENJAMIN I. SACHS
1525 Massachusetts Avenue
Cambridge, MA 02138
Telephone:   (617) 384-5984
Facsimile:    (617) 496-5156 (fax)
Email: bsachs84@gmail.com


By: _____

JAMES M. PIOTROWSKI
Herzfeld & Piotrowski, LLP
P.O. Box 2864
824 W. Franklin Street
Boise, Idaho 83701
Telephone:   (208) 331-9200
Facsimile:    (208) 331-9201
Email: james@idunionlaw.com

*Attorneys for Plaintiff*

# EXHIBIT A

**Proposed Fair Representation Fee Agreement**

Whereas, the Union, in its capacity as exclusive representative of the bargaining unit, has a duty under federal labor law to fairly represent all employees in the unit, regardless of whether the employees choose to be Union members;

Whereas, the Union's duty of fair representation requires that the Union negotiate and administer the collective bargaining agreement ("CBA") on behalf of all bargaining unit employees, regardless of whether employees choose to be Union members;

Whereas, it would serve the interests of fairness and help preserve labor peace and harmony within the bargaining unit if all bargaining unit employees, regardless of Union membership status, were required to pay for the expenses incurred by the Union in performing its duties as exclusive representative for the unit, rather than this financial burden being borne by only a subset of the unit employees, with the remaining employees free riding on the contributions of their co-workers.

Now, therefore, it is hereby agreed by the Union and the Employer that:

1. Beginning on January 1, 2016, each bargaining unit employee is required, as a condition of employment, and without regard to union membership status, to pay a monthly fair representation fee equal to 1.0 times the employee's hourly wage for deposit in the Union's fair representation account for this bargaining unit.

2. Bargaining unit employees may, but are not required to, authorize payment of the fair representation fee through payroll deductions, and the Employer shall honor such authorizations, and transmit such fees to the Union.  For Union members, the fair representation fee will be deducted from their membership dues payment and deposited in the fair representation account provided for in paragraph 3.

3. All fair representation fees, whether received through payroll deduction or otherwise, will be deposited by the Union into a separate, segregated, interest bearing bank account ("the fair representation account").

4. Funds in the fair representation account will be used by the Union solely to pay for the Union's costs related to: (a) negotiating the CBA on behalf of this bargaining unit and printing copies of the CBA for distribution to bargaining unit employees; and (b) implementing and administering the CBA on behalf of this bargaining unit, including processing grievances arising therefrom.  Funds in the account shall not be used for any other purposes.

5. At the end of each calendar year, the Union will provide to all bargaining unit employees an accounting of how the funds in the fair representation account were spent.

6. The Union will provide annual notice to all bargaining unit members, as well as individual notice to all new hires, regarding the calculation of the fair representation fee

        and the employee's right to challenge the calculation of that fee and the uses to which the funds in the fair representation account were put. The challenge process will include the right to appeal before an impartial arbitrator chosen through the American Arbitration Association's Rules for Impartial Determination of Union Fees, as issued and amended. The Union shall pay the costs of the arbitration.

7.     Should the Union ever cease to be the exclusive representative of this bargaining unit, any funds in the fair representation account that were not spent shall be returned to bargaining unit employees on a pro rata basis based on how much the employee paid in fair representation fees during that calendar year.

8.     This agreement shall apply only to employees who are employed in the bargaining unit for more than thirty (30) days after the execution of this agreement.

9.     This agreement shall be enforced only if the Union obtains a final judgment from a court of competent jurisdiction that the provisions of chapter 20, title 44 of the Idaho Code cannot be applied to preclude enforcement of this agreement.